**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

———————————————————————x
:
UNITED STATES OF AMERICA,         :
:
:
       v.                     :      No. 19-CR-375-WFK-1
:
CHRISTIAAN TRUNZ,           :
:
           Defendant.   :
:
———————————————————————x

## SENTENCING MEMORANDUM ON BEHALF OF CHRISTIAAN TRUNZ

Katya Jestin
Anthony S. Barkow
JENNER & BLOCK LLP
1155 6th Avenue
New York, New York 10036
(212) 891-1600

*Counsel for Christiaan Trunz*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION .................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 3

I.        Christiaan has accepted responsibility for his conduct and made atonements. .................... 3

II.       Christiaan joined Bear Stearns right out of college without any trading experience. ........... 9

III.      Christiaan transitioned to JPMorgan and participated in the conspiracy. ......................... 11

IV.       Through the role he has always played in his family, Christiaan's good character
          has been evident since he was young. ......................................................................... 14

V.        Christiaan and his family have already experienced collateral consequences. .................. 19

DISCUSSION ........................................................................................................ 21

VI.       Legal Standard ............................................................................................... 21

          A.       The Sentencing Factors ........................................................................... 21

          B.       Substantial Assistance to the Government ................................................. 22

VII.      Application of Section 3553(a) Factors to Christiaan Demonstrates the Propriety of
          a Noncustodial Sentence. ............................................................................... 23

          A.       Christiaan is already rehabilitated and will not recidivate. ................................. 23

                   1.       Christiaan's decision to plead guilty and cooperate evinces
                            rehabilitation. ..................................................................................... 23

                   2.       Christiaan's history establishes that he will not recidivate. ........................ 25

          B.       A sentence of time served would ensure that Christiaan is punished
                   sufficiently but not more than necessary. ................................................. 26

          C.       A noncustodial sentence of time served for Christiaan is appropriate to
                   avoid unwarranted disparity. ..................................................................... 27

                   1.       The defendants in this case. ............................................................ 28

                   2.       Defendants in similar cases. ............................................................ 29

CONCLUSION ...................................................................................................... 30

# TABLE OF AUTHORITIES

CASES

*Gall v. United States*, 552 U.S. 38 (2007) ...................................................................21

*Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71 (2d Cir. 2022) .............1

*Hsu v. United States*, 954 F. Supp. 2d 215 (S.D.N.Y. 2013) ..........................................28

*Kimbrough v. United States*, 552 U.S. 85 (2007) .................................................21, 30

*Nelson v. United States*, 555 U.S. 350 (2009) (per curiam) ..........................................21

*Pepper v. United States*, 562 U.S. 476 (2011) ...........................................................22

*United States v. Booker*, 543 U.S. 220 (2005) ...........................................................21

*United States v. Bradford*, 645 F.2d 115 (2d Cir. 1981) ................................................23

*United States v. Brown*, 98 F.3d 690 (2d Cir. 1996) ...................................................22

*United States v. Castillo*, No. 03 CR 835, 2007 WL 582749 (S.D.N.Y. Feb. 26, 2007) ..............25

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) (en banc) ....................................21

*United States v. Chanu*, 40 F.4th 528 (7th Cir. 2022), *cert. denied*, 143 S. Ct. 746 (2023) ............1

*United States v. Doe*, 348 F.3d 64 (2d Cir. 2003) ..................................................22, 27

*United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010) ...................................................22

*United States v. Harrison*, 241 F.3d 289 (2d Cir. 2001) ................................................27

*United States v. Mariano*, 983 F.2d 1150 (1st Cir. 1993) ..............................................28

*United States v. Parker*, 903 F.2d 91 (2d Cir. 1990) ...................................................23

*United States v. Qualls*, 25 F. Supp. 3d 248 (E.D.N.Y. 2014), *aff'd*, 613 F. App'x 25 (2d Cir. 2015) ....................................................................................29

*United States v. Singh*, No. 13-CR-570, 2014 WL 4773982 (E.D.N.Y. Sept. 24, 2014) .............27

*United States v. Watt*, 707 F. Supp. 2d 149 (D. Mass. 2010) ........................................25

*United States v. Wong*, 40 F.3d 1347 (2d Cir. 1994) ...................................................23

STATUTES

18 U.S.C. 3661 ..............................................................................................21

18 U.S.C. § 3553(a) ................................................................................................................3, 30

18 U.S.C. § 3553(a)(6) ...............................................................................................................27

18 U.S.C. 3663A .........................................................................................................................28

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124
    Stat. 1376 (2010) ................................................................................................................1

OTHER AUTHORITIES

Amended Judgment, *United States v. Zhao*, No. 18-cr-00024 (N.D. Ill. Feb. 18, 2020), ECF
    No. 78 ............................................................................................................................ 29-30

Complaint, *Mehta v. JPMorgan Chase & Co.*, No. 20-cv-05124 (E.D.N.Y. Oct. 24, 2020),
    ECF No. 1 ..................................................................................................................... 20-21

Deferred Prosecution Agreement, *United States v. JPMorgan Chase & Co.*, No. 20-cr-
    00175 (D. Conn. Sept. 29, 2020), ECF No. 2, https://www.justice.gov/criminal-
    fraud/file/1323586/download ...............................................................................8, 9, 28

Judgment, *United States v. Edmonds*, No. 18-cr-00239 (D. Conn. June 15, 2023), ECF No.
    57 ...................................................................................................................................28

Judgment, *United States v. Liew*, No. 17-cr-00001 (N.D. Ill. Nov. 17, 2021), ECF No. 95 .........29

Judgment, *United States v. Mohan*, No. 18-cr-00610 (S.D. Tex. July 19, 2021), ECF No.
    56 ...................................................................................................................................30

Jury Verdict as to Gregg Smith, *United States v. Smith*, No. 19-cr-00669 (N.D. Ill. Aug.
    10, 2022), ECF No. 676 ...................................................................................................... 7-8

Jury Verdict as to Michael Nowak, *United States v. Smith*, No. 19-cr-00669 (N.D. Ill. Aug.
    10, 2022), ECF No. 677 ...................................................................................................8

Minute Order, *United States v. Edmonds*, No. 18-cr-00239 (D. Conn. June 13, 2023), ECF
    No. 56 ............................................................................................................................28

Minute Order, *United States v. Smith*, No. 19-cr-00669 (N.D. Ill. Aug. 10, 2022), ECF No.
    673 .................................................................................................................................7

Minute Order as to Gregg Smith, *United States v. Smith*, No. 19-cr-00669 (N.D. Ill. June
    5, 2023), ECF No. 887 .......................................................................................................7

Minute Order as to Michael Nowak, *United States v. Smith*, No. 19-cr-00669 (N.D. Ill.
    June 5, 2023), ECF No. 888 ...............................................................................................7

Order, *United States v. Flaum*, No. 19-cr-00338 (E.D.N.Y. Mar. 10, 2023) ...............................28

Press Release, CFTC, *CFTC Action, Former Precious Metal Trader Admits to Engaging in Spoofing at Two New York Banks* (Sept. 16, 2019), https://www.cftc. gov/PressRoom/PressReleases/8014-19 ....................................................................9, 20

Press Release, Department of Justice Office of Public Affairs, *JPMorgan Chase & Co. Agrees To Pay $920 Million in Connection with Schemes to Defraud Precious Metals and U.S. Treasuries Markets* (Sept. 29, 2020), https://www.justice.gov/opa/ pr/jpmorgan-chase-co-agrees-pay-920-million-connection-schemes-defraud-precious-metals-and-us ......................................................................................................1, 8

Sentencing Memorandum, *United States v. Edmonds*, No. 18-cr-00239 (D. Conn. June 1, 2023), ECF No. 54 .........................................................................................................5

Sentencing Memorandum, *United States v. Edmonds*, No. 18-cr-00239 (D. Conn. June 7, 2023), ECF No. 55 .......................................................................................................28

Transcript of Proceedings, *United States v. Smith*, No. 19-cr-00669 (N.D. Ill. July 19, 2022), ECF No. 772 ................................................................................... *passim*

Transcript of Proceedings, *United States v. Smith*, No. 19-cr-00669 (N.D. Ill. July 20, 2022), ECF No. 773 ...............................................................................11, 12, 13

Transcript of Proceedings, *United States v. Smith*, No. 19-cr-00669 (N.D. Ill. July 21, 2022), ECF No. 775 .........................................................................................7, 11

Transcript of Proceedings, *United States v. Smith*, No. 19-cr-00669 (N.D. Ill. July 28, 2022), ECF No. 782 ......................................................................................5, 6, 7

## INTRODUCTION

Christiaan Trunz respectfully submits this sentencing memorandum in advance of his

sentencing hearing, scheduled for June 27, 2023 at 2:00 p.m.  On August 19, 2019, Christiaan

pled guilty to conspiracy and spoofing.[1]  In connection with his guilty plea, Christiaan entered

into a cooperation agreement with the United States Department of Justice, Criminal Division,

Fraud Section (the "Government"), whereby he provided information and assistance to the

Government, culminating in three days of testimony at trial and the successful prosecution of

two of his co-conspirators.  Christiaan also supplied critical information to support the

Government's resolution with JPMorgan Chase ("JPMorgan"); JPMorgan entered into a deferred

prosecution agreement with the Government pursuant to which JPMorgan paid a significant fine

and implemented strict compliance measures.[2]

Christiaan acknowledges, regrets, and takes full responsibility for his wrongdoing:

participating in unlawful trades in the precious metals futures market.  Christiaan learned to trade

precious metals futures – and to "spoof" – when he first began to trade commodities futures as a

junior trader immediately after graduating from college.  As a twenty-two-year-old whose main

job was to pick up sandwiches for the team and "to sit there and listen and learn," Transcript of

Proceedings, *United States v. Smith*, No. 19-cr-00669 (N.D. Ill. July 19, 2022), ECF No. 772

("7/19/22 Tr."), 2269:25-2270:3, Christiaan learned to spoof because he was taught to spoof by

---

[1] Spoofing is a "fraudulent practice in which the spoofing traders send false supply and demand signals to the market by placing orders to buy or sell that they never intend to execute." *Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 75 (2d Cir. 2022).  Spoofing was codified as illegal in 2011 when the Dodd-Frank Wall Street Reform and Consumer Protection Act was amended to include spoofing as an unlawful prohibited transaction.  Pub. L. No. 111-203, 124 Stat. 1376 (2010); *see also United States v. Chanu*, 40 F.4th 528, 534–35 (7th Cir. 2022), *cert. denied*, 143 S. Ct. 746 (2023).
[2] *See* Press Release, Department of Justice Office of Public Affairs, *JPMorgan Chase & Co. Agrees To Pay $920 Million in Connection with Schemes to Defraud Precious Metals and U.S. Treasuries Markets* (Sept. 29, 2020), https://www.justice.gov/opa/pr/jpmorgan-chase-co-agrees-pay-920-million-connection-schemes-defraud-precious-metals-and-us ("DOJ Press Release").

his senior colleagues and supervisors on the precious metals desk.  Those senior traders included Gregg Smith and Michael Nowak, Christiaan's supervisors.  Driven by his aspiration to excel at JPMorgan, Christiaan relied on these senior traders, whom he also considered close friends and mentors, to teach him how to properly trade.  Accordingly, replicating the patterns employed by his experienced team members, Christiaan initiated orders and canceled them.  Eventually, Christiaan understood that this way of trading was improper, at which point he stopped spoofing.  Once he fully recognized that spoofing was illegal, Christiaan came forward, took responsibility for his participation in the conduct, agreed to cooperate, and provided valuable information and assistance that helped the Government build its case against his co-conspirators.  Christiaan decided to plead guilty and cooperate with the Government because "it was the truth" and he "had the guts to admit the truth."  7/19/22 Tr. 2290:16-17.  Christiaan also took the initiative to resign from his position at JPMorgan the same day he pled guilty.  Christiaan told the truth amidst external pressures, including directives from his then-boss and former mentor, Michael Nowak, not to plead guilty or to cooperate with the Government.

Christiaan's guilty plea and extensive cooperation with the Government in its successful prosecution of Gregg Smith and Michael Nowak establish Christiaan's acceptance of his wrongdoing, his willingness to remedy his unlawful conduct, and his sincere respect for the truth.  They also evidence Christiaan's role in the conspiracy.  Christiaan pled guilty to the general intent crime of spoofing and conspiracy to spoof.  That is, the intent requirement for spoofing requires only that a person place an order without the intent to execute it – even if the order is in fact executed – in contrast to the fraud offenses of which Smith and Nowak were convicted and to which other cooperators pled guilty, which require an intent to deceive or defraud.

Christiaan did not plead guilty to committing fraud or to fraud-related offenses. Pursuant to the trading techniques he learned from his superiors, Christiaan initiated orders without the intent to execute them, and canceled them. Unlike his senior colleagues, though, Christiaan did not initiate orders with the intent to defraud others. And unlike his senior colleagues who built a business model on defrauding others, Christiaan participated in this conduct as a junior trader without any experience in the field and on the advice of his boss and mentors. Once he understood the impropriety of this technique as a consequence of an internal compliance review at JPMorgan, Christiaan ceased this style of trading. In addition, after the Government began to investigate the trading patterns on the precious metals desk, Christiaan cooperated fully.

Christiaan accepts responsibility for and, through this memorandum, does not attempt to minimize the seriousness of his crime. Rather, this memorandum situates Christiaan's wrongdoing within the broader context of his life. It is meant to equip the Court with a picture of the "history and characteristics of the defendant" to establish that a noncustodial sentence is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing. *See* 18 U.S.C. § 3553(a). More specifically, the "history and characteristics" of Christiaan are illustrated herein through (1) his acceptance of wrongdoing, his guilty plea, and his extensive and valuable cooperation; (2) his early professional development and participation in the conspiracy; (3) his role in his family life from his upbringing through adulthood; and (4) the significant adverse collateral effects of his conduct on his family and daily life. For the reasons stated herein, Christiaan should receive a sentence of time served without supervision.

## FACTUAL BACKGROUND

I.     **Christiaan has accepted responsibility for his conduct and made atonements.**

On August 19, 2019, Christiaan pled guilty to conspiracy and spoofing charges and agreed to cooperate with the Government in its ongoing investigation and prosecution of

3

Defendants Gregg Smith, Michael Nowak, and Jeffrey Ruffo.  That same day, Christiaan resigned from his position at JPMorgan Chase.  Days later, the Government indicted Smith, Nowak, and Ruffo.

Christiaan was an exemplary cooperating witness throughout the Government's investigation and at trial.  Christiaan met with the Government five times prior to the case being charged, assisting them in their investigation by truthfully and completely answering any and all questions they asked.  He again met with the Government on a series of occasions to prepare for his testimony at trial. Thereafter, Christiaan testified for the Government over three days at trial. During direct examination, Christiaan explained in detail to the jury the dynamics of the precious metals desk and its members, how he learned to spoof, and what spoofing looked like in practice. He patiently walked the jury through complex trading patterns, explained industry jargon, and relived the emotional hurdles of turning his back on the defendants who were his supervisors and teachers and, for years, whom he considered his close friends and mentors.  Christiaan also explained important documentary evidence including transcripts of electronic chats in which he and the defendants and others at the desk discussed spoofing and the strategies they implemented.

Throughout his time on the stand, Christiaan never minimized his role in the conspiracy, nor was he ever argumentative or combative.  He openly testified that he spoofed often, likely over a "thousand times."  7/19/22 Tr. 2294:7-8.  He testified that he pled guilty because he engaged in spoofing and was a participant in the conspiracy for years.  *Id*. at 2290:14-25.  He testified, in detail, how exactly he spoofed.  *Id*. at 2295:8-2296:3.  He walked the jury through the trading pattern that constitutes spoofing, explaining scores of visually depicted examples, rendering a complex and esoteric subject accessible to the jury.  *Id*. at 2278:2-79:23, 2294:7-

4

97:7, 2351:11-53:17.  He explained that, after all of his involvement, he knew he had to plead guilty "[b]ecause it was the truth."  *Id.* at 2290:14-17.

Christiaan spent three days on the witness stand including two full days of rigorous and often times emotional cross examination, conducted in three separate segments by skilled and experienced counsel for each defendant.  Christiaan was pushed to discuss personal and sensitive issues such as his detainment and interrogation at the airport on the way to his wedding and then again while he was traveling home with his wife from their honeymoon as well as the detrimental effects of what he has experienced throughout the pendency of this matter on his mental health and his family.  Still, Christiaan remained even-keeled and respectful throughout.

Christiaan was an extremely powerful and effective witness.  The frequency with which the Government used Christiaan's testimony throughout its closing argument emphasizes the weight of the evidence Christiaan provided and the critical nature of Christiaan's testimony to the trial's outcome.  *See* Transcript of Proceedings, *United States v. Smith*, No. 19-cr-00669 (N.D. Ill. July 28, 2022), ECF No. 782 ("7/28/22 Tr."), 3902:14-18 ("And on the witness stand, Mr. Trunz and Mr. Edmonds[3] gave you an insider's account of the criminal activity that took place as they worked side by side with the defendants on the desk watching and learning from them."); *id.* at 3902:20-25 ("Mr. Trunz and Mr. Edmonds explained the unmistakable four-step pattern of deceptive trading that is spoofing and market manipulation. . . They learned from the senior members of the desk:  Gregg Smith and Mike Nowak."); *id.* at 3903:2-5 ("[O]n the stand, Mr. Trunz and Mr. Edmonds both acknowledged that they themselves were spoofing, but they also told you how Mr. Smith and Mr. Nowak traded, how they spoofed, and why they did it.");

---

[3] John Edmonds was another cooperating witness who also testified against Smith and Nowak at trial. Sentencing Memorandum, *United States v. Edmonds*, No. 18-cr-00239 (D. Conn. June 1, 2023), ECF No. 54.

*id.* at 3904:5-8 ("Mr. Trunz told you how Mike Nowak, his boss, pressured him not to cooperate with the government, pressured him not to tell the truth about what was happening for all those years on the desk."); *id.* at 3907:4-6 ("And Mr. Trunz and Mr. Edmonds told you they saw Mr. Smith spoof on an almost daily basis and that they learned to spoof by watching Mr. Smith."); *id.* at 3911:10-15 ("And as Mr. Trunz told you, it's a pattern that we've seen over and over and over again with the same intention, and it's the same pattern that leads you to the same conclusion: Mr. Smith and Mr. Nowak were placing orders that they always unconditionally intended to cancel before execution.  They were spoofing."); *id.* at 3914:8-11 ("Mr. Trunz, Mr. Edmonds, and Mr. Flaum each explained to you how they used their spoof orders to manipulate precious metals markets and drive prices to artificial levels whether they wanted to buy or sell."); *id.* at 3917:4-7 ("Now, Mr. Trunz and Mr. Edmonds told you how they spoofed to manipulate the price so they could trade at prices that they chose, that they wanted to trade at.  And they learned to do this on the desk by watching Mr. Smith trading."); *id.* at 3920:17-23 ("Now, Mr. Trunz, he told you how placing these large layered group of orders was a strategy to deceive and place false volume into the marketplace.  Mr. Trunz explained that this clicking was to 'deceive and manipulate the algorithms to execute on prices that we wanted to try to get them to execute on, that they necessarily wouldn't have executed on if we didn't.'"); *id.* at 3928:6-15 ("So the first element, whether the conspiracy existed, how do you know?  You heard it straight from the mouth of two members of the conspiracy:  Christia[a]n Trunz and John Edmonds.  They both sat up there and admitted that they were in a criminal conspiracy with these three defendants.  They explained to you how it was the understanding and the expectation on the desk that the traders – including Mr. Smith, Mr. Nowak, Mr. Trunz, and Mr. Edmonds – would spoof and manipulate the markets to get better prices and make money for themselves and for the desk."); *id.* at

3928:20-24 ("Now, Mr. Trunz and Mr. Edmonds each described to you how as junior guys on the desk they learned to spoof because that's what's expected of a trader on JPMorgan's precious metals desk.  It was understood and agreed that you would spoof to get the good fills when you were trading."); *id.* at 3952:17-22 ("And there's one particular part of Mr. Trunz's testimony that I think is especially key here.  And Mr. Trunz explained to you that for years, it was routine for JPMorgan's precious metals desk to conduct the business of the desk through spoofing.  And there was an agreement and an understanding among the members of the desk to do just that."); *id.* at 3935:14-18 ("You heard from Mr. Trunz that when JPMorgan and the Department of Justice were investigating, Mr. Nowak, the boss, exerted tremendous pressure on Mr. Trunz to hide his wrongdoing and protect the narrative, protect the desk, protect their conspiracy."); *see also id.* at 3908:2-4, 3909:13-16, 3911:4-6, 3914:21-3915:3, 3918:18-22, 3921:7-11, 3921:17-23, 3930:7-16, 3931:18-19, 3933:21-3934:6, 3934:22-3935:3, 3936:19-3937:2, 3938:10-17, 3940:5-3941:24, 3944:15-19, 3945:14-17, 3946:11-14, 3946:20-24, 3953:1-9.  Relying in significant part on Christiaan's testimony, on August 10, 2022, the jury convicted both Nowak and Smith of attempted price manipulation, wire fraud, commodities fraud, and spoofing.[4]  Minute Order, *United States v. Smith*, No. 19-cr-00669 (N.D. Ill. Aug. 10, 2022), ECF No. 673; Jury Verdict as

---

[4] At the conclusion of trial, the jury acquitted Jeffrey Ruffo of both charges against him, racketeering and conspiracy.  Ruffo, unlike Smith and Nowak, was neither a trader nor one of Christiaan's supervisors and did not teach Christiaan how to trade; Ruffo was a salesperson who capitalized on his connections to act as a source of clients for Nowak and Smith and as a "liaison" for Nowak's and Smith's trades.  7/19/22 Tr. 2270:16-21, 2292:5-6.  Christiaan's testimony established that Smith executed the trades for Ruffo's clients, and Ruffo's involvement in and oversight of Christiaan's trading techniques was extremely attenuated.  Indeed, Christiaan testified that Ruffo offered encouragement for Smith and Nowak to spoof but that he never explicitly told Smith or Nowak – or Christiaan himself – to spoof.  Transcript of Proceedings, *United States v. Smith*, No. 19-cr-00669 (N.D. Ill. July 21, 2022), ECF No. 775 ("7/21/22 Tr."), 2663:25-2665:1.  As of the date of the filing of this memorandum, Smith and Nowak have not yet been sentenced.  Smith's sentencing is scheduled for August 17, 2023, and Nowak's sentencing is scheduled for August 18, 2023, both to occur in the Northern District of Illinois before the Honorable Edmond E. Chang.  Minute Order as to Gregg Smith, *United States v. Smith*, No. 19-cr-00669 (N.D. Ill. June 5, 2023), ECF No. 887; Minute Order as to Michael Nowak, *United States v. Smith*, No. 19-cr-00669 (N.D. Ill. June 5, 2023), ECF No. 888.

to Gregg Smith, *United States v. Smith*, No. 19-cr-00669 (N.D. Ill. Aug. 10, 2022), ECF No. 676; Jury Verdict as to Michael Nowak, *United States v. Smith*, No. 19-cr-00669 (N.D. Ill. Aug. 10, 2022), ECF No. 677.

Significantly, as noted, Christiaan's cooperation also helped the Government secure its resolution with JPMorgan.[5]  Christiaan played a vital role in helping the Government build its case against the bank itself, in addition to assisting in the prosecution of the individual defendants, by providing information to the Government during the case's investigative phase. The resolution with JPMorgan resolved criminal charges related to tens of thousands of unlawful trading instances for precious metals futures contracts and for U.S. Treasury futures contracts at JPMorgan.  The deferred prosecution agreement cited and relied on information about Christiaan's involvement in the conspiracy, including detailed examples of Christiaan's spoofing activity and chats between Christiaan and other precious metals traders discussing their trading techniques and strategies.[6]  The resolution required that JPMorgan pay a fine, forfeiture, and restitution in the amount of over $920 million, disclose information related to the facts underlying the charges, and implement an innovative new corporate compliance program.  In order to remediate the established lack of training and oversight for traders, the corporate compliance program mandated the launch and implementation of improvements to JPMorgan's anti-fraud and manipulation training and policies and introduction of tools and processes to facilitate more efficient supervision of traders.  These included required training sessions, implementation of an effective system to provide guidance and advice on compliance and firm policies, and disbursement of specific historical scenarios that constitute spoofing for educational

---

[5] *See* DOJ Press Release.
[6] Deferred Prosecution Agreement at 11–12, *United States v. JPMorgan Chase & Co.*, No. 20-cr-00175 (D. Conn. Sept. 29, 2020), ECF No. 2 ("JPMorgan Deferred Prosecution Agreement").

purposes.  Through the resolution, JPMorgan paid in full restitution to compensate all victims of all the defendants' conduct, including Christiaan's, in this case.[7]

In addition to the JPMorgan resolution, Christiaan agreed to enter into a separate settlement and order with the Commodity Futures Trading Commission ("CFTC") in connection with the underlying conduct in this action.  There, in exchange for his cooperation and "substantial assistance" to the CFTC's "pursuit of other offenders," the CFTC reserved immediate issuance of any penalties, but future penalties against Christiaan remain possible.[8] The CFTC order concluded that Christiaan learned to spoof from more senior traders at JPMorgan and deployed the strategy for years with their consent and oversight.  This conclusion was consistent with Christiaan's testimony at the criminal trial of Smith and Nowak – that he had been taught, trained, and encouraged to spoof by his superiors since he first began as a junior trader at Bear Stearns.

## II.    Christiaan joined Bear Stearns right out of college without any trading experience.

Although he did not have any experience with trading before coming to Bear Stearns and then JPMorgan, Christiaan had always aspired to work in the field.  Christiaan's father, Charles, held several top executive positions at JPMorgan between 1985 and 2001.  Christiaan and his three brothers grew up spending a significant amount of time with Charles and his coworkers at JPMorgan.  Christiaan and his brothers attended every JPMorgan holiday party and every "bring-your-son-to-work-day."  7/19/22 Tr. 2267:24-2268:1.  Growing up, JPMorgan was a "part of [their] family."  *Id.*  Inspired by his time at JPMorgan as a child and his familial-like relationship

---

[7] *Id.*; *see also* Presentence Investigation Report ("PSR"), ¶¶ 15, 17, 76.
[8] Press Release, CFTC, *In CFTC Action, Former Precious Metal Trader Admits to Engaging in Spoofing at Two New York Banks* (Sept. 16, 2019), https://www.cftc.gov/PressRoom/PressReleases/8014-19 ("CFTC Press Release").

with JPMorgan and Charles's coworkers, Christiaan's dream was to pursue a similar career to his father's.

The summer after he graduated from Georgetown University with a degree in finance, twenty-two-year-old Christiaan joined the precious metals desk at Bear Stearns.  As a junior trader without any experience trading or with precious metals, Christiaan's main duties were to get lunch for the desk, to answer the phone, and to "listen and learn."  7/19/22 Tr. 2270:1-3.  There was little to no formal training on the desk, so learning how to perform the job's duties was "trial by fire," and the only way to absorb this information was by watching senior traders, including Smith and Ruffo, execute trades.  *Id*. at 2273:25-2274:4.

Christiaan loved his job.  He quickly realized his desire to move up the ranks to eventually become a spot trader like Smith.[9]  To achieve this goal, Christiaan made every effort to learn from Smith.  He grew to consider Smith a mentor and trusted him to the point where he "emulated him."  7/19/22 Tr. 2272:19-25.  Throughout their time working together, Smith referred to Christiaan as "[J]unior."  *Id*. at 2272:21.  Since there was very minimal training on the desk and the only way to learn was by watching other traders do their jobs, Christiaan would frequently pull up a chair to watch Smith trade.  Watching Smith and the other senior members of the desk trade was how Christiaan learned to trade the way they did – that is, to spoof.  Smith and Christiaan's other coworkers referred to spoofing as "layering" or "clicking."  "Clicking" often involved repetitively clicking a mouse to place offers which, in order to deceive the algorithms, created the illusion of real demand when there was in fact none.  Christiaan and Smith would joke around about "clicking," but Smith never referred to it as spoofing, nor did he ever communicate to Christiaan that it was unlawful.  During his first year at Bear Stearns,

---

[9] Smith traded in the spot market for physical gold.  7/19/22 Tr. 2285:23-24, 2325:24-2326:8.

10

without any textbooks or training courses, Christiaan exclusively learned to trade by watching senior members of the desk like Smith and "soak[ing] it up like a sponge."  7/19/22 Tr. 2274:3-4.

### III.    Christiaan transitioned to JPMorgan and participated in the conspiracy.

During the 2008 financial crisis, JPMorgan hired Christiaan, Smith, Ruffo, and others to come over from the Bear Stearns precious metals desk.  Christiaan had not even worked at Bear Stearns for a full year before he moved to JPMorgan.  Upon the team's transition, Nowak became the "new boss."  7/19/22 Tr. 2284:10-12.  In their new office space at JPMorgan, Christiaan sat within a few feet of Nowak, Smith, and Ruffo.  Although they were his senior colleagues, Christiaan became fast friends with them.  Transcript of Proceedings, *United States v. Smith*, No. 19-cr-00669 (N.D. Ill. July 20, 2022), ECF No. 773 ("7/20/22 Tr."), 2416:21-23, 2478:18-19; *see also* Transcript of Proceedings, *United States v. Smith*, No. 19-cr-00669 (N.D. Ill. July 21, 2022), ECF No. 775 ("7/21/22 Tr."), 2685:4-7.  The four of them would talk and "banter" all day.  7/19/22 Tr. 2284:7.  As Christiaan worked more closely with his new boss, Nowak, they developed a strong bond and Christiaan came to "love him."  *Id*. at 2284:19-20. Christiaan would even spend some of his free time with Nowak and Nowak's wife and kids. 7/20/22 Tr. 2539:14-17.  Christiaan also maintained his close friendship and mentor relationship with Smith and Ruffo.

For the next five years, determined to become a spot trader like Smith, Christiaan sat next to Smith and watched him trade.  Christiaan would also watch and learn from Nowak.  Christiaan witnessed Smith spoof – or, as they referred to it at the time, "click" – almost every day.  He witnessed Nowak spoof "weekly."  7/19/22 Tr. 2292:1.  Like at Bear Stearns, there was little to no formal training at JPMorgan, so Christiaan continued to learn by watching his supervisors and mentors trade.  Everything he knew about trading throughout his career at JPMorgan, he learned from watching the senior members trade.  7/20/22 Tr. 2437:4-9, 2407:15-2408:12.  Since the day

he started working on the desk, he was "trained, educated, and promoted" on spoofing.  *Id*. at 2407:16-18.  He trusted that Smith and Nowak knew what they were doing because they "ha[d] been doing it. . . for combined more years than [he'd] been alive."  *Id*. at 2407:25-2408:2. Smith, Nowak, and Ruffo never mentioned to Christiaan that spoofing was improper or illegal. To the contrary, it was the method of training he was taught and observed daily.

Christiaan eventually became the "backup spot trader" for Smith and would execute orders in his absence.  7/19/22 Tr. 2285:3-5.  Smith's method of trading was not intuitive so, since Smith was clearly respected by his peers and successful at his job, Christiaan emulated Smith and employed the same method he witnessed Smith use almost daily.  Spoofing, or "clicking," was a "well-known strategy on the desk" traders used.  *Id*. at 2290:20-22.  Every member of the desk routinely and openly traded that way for years.  There was an understanding among the members of the desk that if they did not spoof to get their clients the best possible prices, JPMorgan would lose their clients' business.  Christiaan spoofed because that is the way the desk traded.  He did not spoof with fraudulent intent, as reflected in the charges to which Christiaan pled guilty.  Christiaan now fully recognizes the impropriety of his actions, but the openness with which the other members of the desk discussed and employed this strategy long-hindered his appreciation of the conduct.

In the summer of 2016, JPMorgan initiated a four-month compliance review of Christiaan's trades after some of his trades were flagged.  During this four-month period, his boss, Nowak, coached Christiaan how to handle the situation.  Nowak had breakfast with Christiaan every day.  Nowak had been responsible for the trajectory of Christiaan's career ever since Christiaan first met him following the transition from Bear Stearns.  As his boss and mentor, Christiaan trusted Nowak immensely.  Before Christiaan entered his first compliance

interview, Nowak directed him, "Remember. . . every order you put into the market, you intended to trade on." 7/20/22 Tr. 2415:13-16. But of course, given that Christiaan had been spoofing – like Nowak and Smith had taught him – this directive was not true. Still not fully identifying the fraudulent intentions of his mentors and senior colleagues, Christiaan understood that his fulfillment of Nowak's directive was necessary to keep his job. For this reason, Christiaan lied during his compliance review. He wanted to protect the "desk's narrative" and the trading patterns they had openly used for years. *Id*. at 2418:14-16.

Later in 2016, as a consequence of his compliance review, Christiaan stopped "clicking" or spoofing. Though, for his prior initiation of illegitimate trades, Christiaan was placed on probation from trading and received a written warning and a reduced bonus. Having learned that the way he had been taught to trade was contrary to how JPMorgan's compliance department had now told him he should trade – and because he knew that other traders, particularly junior traders, had been taught to and did trade in the same manner – Christiaan volunteered that examples of his trading patterns should be used in trainings to advise other more junior traders not to spoof. 7/20/22 Tr. 2419:25-2420:18. Those examples were then incorporated into JPMorgan's training materials. *Id*. Christiaan thought the examples would be beneficial because, as he had not fully appreciated that the method of trading he had been taught during his early years on the desk was improper, he anticipated other junior traders would likewise not understand the implications of the routine trading techniques they had been taught.

About two years after he stopped spoofing, in December 2018, Christiaan was stopped and questioned at the airport first while traveling to his wedding and then again on the way home from his honeymoon. After learning of Christiaan's airport detention, Nowak met with Christiaan several more times to discuss the investigation. In these meetings, Nowak pressured

13

Christiaan not to plead guilty.  Influenced by these conversations with Nowak, while simultaneously equipped with the knowledge that he had participated in wrongful conduct, Christiaan initially struggled with a path forward.  Ultimately, in August 2019, in contravention of the pressure Nowak had been applying to him for months, Christiaan decided to plead guilty, accept responsibility, resign from JPMorgan, and cooperate with the Government.  While this was undeniably a difficult step to take, Christiaan's upstanding character and values evidence that it was an unavoidable – and inherently the correct – step for him to take.

**IV.    Through the role he has always played in his family, Christiaan's good character has been evident since he was young.**

Christiaan grew up in Manhasset on Long Island, New York.  Throughout his childhood and adolescence, Christiaan was a well-rounded student and athlete.  He played three varsity sports and was captain of the top-ten-ranked Chaminade High School lacrosse team, all while playing on his school's string orchestra, remaining an active member of the National Honor Society, receiving the President's Award of Educational Excellence, and volunteering with his high school's community outreach program, through which volunteers would "help at local community events, assist at senior care facilities, [and] organize food and clothing drives." Exhibit 7, Brother Thomas J. Cleary Letter at 1.

The second oldest of four boys, Christiaan has been close with his three brothers, Chas, Max, and Jack, since childhood.  This close bond intensified when Christiaan's mother, Gerry, developed terminal ovarian cancer and eventually passed away in 2006 at the age of forty-nine. Christiaan, who was only fifteen years old at the time, stepped up and offered crucial support for his family throughout his mother's illness.  His younger brother, Max, who was eleven years old at the time, recalls how Christiaan essentially helped raise him throughout their mother's illness. Christiaan helped Max with his homework, taught him how to cook, played sports with him to

take his mind off the situation, and "explain[ed] exactly what was happening with [their] Mom, even though it was. . . equally as hard" for Christiaan at the time.  Exhibit 4, Max Trunz Letter at 1.  Christiaan's youngest brother, Jack, recalls how, at the age of ten, he experienced severe anxiety and trouble sleeping throughout his mother's illness.  Exhibit 5, Jack Trunz Letter.  Jack recalls how he would wander into Christiaan's room in the middle of the night when he had trouble sleeping, where Christiaan would then entertain all his questions until he fell asleep.  *Id.* Jack continued to do this nearly every day until Christiaan left for college, Christiaan sacrificing his alone time to comfort his youngest brother.  *Id.*  Christiaan's older brother, Chas, who was away at college during most of their mother's illness, recalls how Christiaan "shielded [him] from the pain and suffering" that their mother was experiencing, "unless it was necessary to be shared."  Exhibit 3, Chas Trunz Letter at 2.

Christiaan was always close with his mother, but his family remembers how much he stepped up to be there for her after she was diagnosed with cancer.  Christiaan was there for his mother throughout her two chemotherapy treatments.  He was his mother's "cheerleader" and maintained strength for her and the family during her more-than-four-year battle with cancer. Exhibit 2, Charles Trunz Letter.  Christiaan's father remembers that Christiaan never gave up hope and provided his mother with love and support throughout her illness.  *Id.*  He even learned to cook so that his mother would no longer have to cook for their family.  Christiaan's older brother, Chas, remembers that Christiaan constantly accompanied their mother to the hospital to receive treatment and never complained once.  Exhibit 3, Chas Trunz Letter at 2.

At the time of his mother's death, Christiaan was twenty years old and a junior at Georgetown University.  In pursuit of his dream to work in banking like his father, Christiaan enrolled in the business school at Georgetown in 2003 with a major in finance.  Christiaan also

received a partial athletic scholarship to play varsity lacrosse at Georgetown.  In addition to playing lacrosse, Christiaan helped found and lead a charitable organization called "Hoya Dreams" through which Georgetown athletes visited with and entertained children at the Georgetown Children's Hospital.  Exhibit 11, David Bauer Letter.  The organization still exists at Georgetown today.

Around February 2006, shortly before his mother's death, Christiaan returned home to Long Island for about six weeks to spend time with his mother and help his father and brothers after she passed away.  Christiaan missed classes, practices, and lacrosse games during this time.  Still grieving but offering support to his family from afar, Christiaan returned to Georgetown in March, where he continued to excel both in the classroom and on the lacrosse field.

Following his mother's death, Christiaan's family recalls that he stepped up as "the leader of stability and care" for his father, three brothers, extended family, and close friends.  Exhibit 2, Charles Trunz Letter at 1.  Christiaan's stepmother recalls how Christiaan always ensured his youngest brother, Jack, was alright, "taking Jack everywhere he could, literally putting Band-Aids on his knees, making him take a shower, and keeping him laughing all the time."  Exhibit 6, Mary Beth Austin Trunz Letter at 1.  In the years that followed, still suffering from the loss of his mother and in search of familial support, Jack would often visit Christiaan at Georgetown where Christiaan would spend his undergraduate weekends with his youngest brother, often even after a "big college win."  Exhibit 5, Jack Trunz Letter at 1.  Christiaan would take Jack to watch his lacrosse games and spend the rest of his weekends entertaining Jack and keeping his mind off the loss of their mother, showing Jack the historic monuments in Washington, D.C., trying new burger spots, and spending the night playing video games.  *Id*.

When his brother Chas's struggles with alcohol abuse worsened following their mother's death, Christiaan conducted the relevant research and organized an intervention that persuaded Chas to enter rehabilitation. Exhibit 3, Chas Trunz Letter at 2. Chas recalls that, even though he slipped a few times, Christiaan never turned his back on him and would always make sure Chas had somewhere to sleep and received the help he needed, meanwhile checking in to ensure Chas's family was alright. *Id*. at 2–3. Christiaan was the "pioneer" in Chas's recovery and helped him achieve and maintain sobriety since, something Chas insists he could not have done without Christiaan. *Id*. With Christiaan's help, Chas now has a "life beyond [his] wildest dreams." *Id*.

Christiaan did not give up his caretaking role when he entered adulthood. In December 2018, Christiaan married Camila Vignaud. On May 25, 2021, their son Aksel was born. On December 13, 2022, Camila gave birth to their second child, Oskar. Following his guilty plea and resignation from JPMorgan in August 2019, Christiaan spent significant time applying for new jobs but to no avail. Besides his time spent volunteering, Christiaan spent the majority of his time caring for Camila while she was pregnant and then thereafter for Camila and their newborn son. While Camila was pregnant, Christiaan "kept a smile on his face," "never complained," and did everything he could to help Camila "through the difficulties of being pregnant during a pandemic." Exhibit 1, Camila Vignaud Letter at 1. After Aksel was born and Camila returned to work, Christiaan took on the role of "stay at home parent." *Id*. at 2. He shopped for and cooked all his family's meals, maintained and cleaned the house, handled all the midnight feedings, and changed Aksel's diapers. Throughout it all, Christiaan never complained, even though he was simultaneously "getting turned down for jobs" and "worried about how he was going to support his family." *Id*. at 1–2. While he has since recently found new

17

employment, Christiaan still maintains the same caretaking duties—cooking the majority of their meals, cleaning the house, and now handling the midnight feedings and diaper changes for their second child, six-month-old Oskar.

Throughout adulthood, Christiaan has maintained a similar role in his relationships with his brothers.  Christiaan's younger brother, Max, recalls how Christiaan was the first person at his apartment following the birth of his first child, Tilly, and how, at the outset of the COVID-19 pandemic, Christiaan and Camila even moved from New York City to Long Island with them so that Christiaan could help Max and his wife adjust and be involved in raising Tilly.  Exhibit 4, Max Trunz Letter at 2.  Now that Jack is older, Christiaan has taken on a mentoring role, letting Jack stay with him in London during Jack's study abroad experience, reviewing and revising Jack's resume, and offering Jack relationship advice.  Exhibit 5, Jack Trunz Letter at 2. Christiaan's older brother, Chas, notes that, although Christiaan is responsible for his sobriety and Chas "owe[s] everything [he has] to him," Christiaan "not once" has asked Chas "for anything in return."  Exhibit 3, Chas Trunz Letter at 3.

In adulthood, Christiaan has also found ways to be there for others in need outside of his family.  He and his brothers established the Trunz Men Scholarship at their high school to "assist young men who cannot afford to attend Chaminade [High School], but who have the academic ability" to advance there.  Exhibit 7, Brother Thomas J. Cleary Letter at 2.  The scholarship has already benefitted nine Chaminade students.  In honor of their mother and to help families with terminally ill loved ones, Christiaan, his brothers, and his father also started a family foundation to raise money to build the first palliative care center at North Shore University Hospital on Long Island.  Exhibit 2, Charles Trunz Letter.  Christiaan led the efforts, giving speeches and helping raise the money for the center.  *Id.*

18

V.      **Christiaan and his family have already experienced collateral consequences.**

Christiaan started at Bear Stearns as an analyst and, by the time he resigned from JPMorgan in 2019, had ascended the ranks to an executive director position, one rank below the highest title in his field.  Christiaan relinquished all this on the day he pled guilty and resigned. Now, Christiaan likely can never work again in a regulated industry like trading, the only work he had ever known.  He began working in this field right out of college, and he knew he wanted to pursue this career from a young age watching his father work in the industry.  Still, Christiaan has made sincere efforts to secure meaningful employment, albeit in different industries unfamiliar to him.

In October 2019, Christiaan discovered a venture he found fulfilling, helping raise funds to start a company with his father to help disabled individuals find and secure employment.  The company, called Inclusively.com, acted as a marketplace for disabled individuals to network, find comfort, access training, and match with suitable employers based on their disability and skillset.  Christiaan worked at Inclusively.com for several months without pay to help establish the organization.  But in August 2020, a corporate client threatened to cut ties with the company if it employed any persons with a felony conviction.  After less than a year in his role, where he raised approximately eighty percent of the necessary funds for the company, Christiaan was forced to resign so that the company and its good work could continue.

Following the termination of his service at Inclusively.com, Christiaan applied to approximately 100 jobs but did not receive any offers, forcing him to endure a lengthy bout of unemployment that unfortunately coincided with the birth of his and Camila's first child and the beginning of the COVID-19 pandemic.  Moreover, after learning of his guilty plea, two banks rejected Christiaan's business and now bar him from personally banking with them.  Because of this substantial period of unemployment and his inability to secure a job or hold a bank account,

19

Christiaan has had to rely heavily on his father and his wife, who has since given birth to their two sons, to financially support his family. Without support from his father, Christiaan would not have been able to pay rent during his unemployment and, although he has since secured employment, he still struggles to support his family. Relatedly, upon moving back to the United States following the guilty plea and Christiaan's resignation from JPMorgan, Christiaan's wife, Camila, also had to search for and secure a new job with adequate pay and benefits for their family.

Christiaan has also experienced considerable personal hardship following his guilty plea. Due to the media attention and high-profile nature of Christiaan's guilty plea and the successful prosecution of Nowak and Smith, Christiaan's conduct has been widely publicized. As a result, his reputation has been tarnished, and he has experienced significant social marginalization. Christiaan's inability to work for significant periods of time, to financially support his family, and to remain a respected member of his community has severely diminished his self-worth and confidence. His wife, Camila, knows that he "worries he will not be able to give [their sons] the future they deserve, the future he worked so hard for them to have." Exhibit 1, Camila Vignaud Letter at 2. Christiaan's family is "deeply concerned about his wellbeing and his ability to adjust to the 'new life' he is now facing." Exhibit 2, Charles Trunz Letter at 2.

Furthermore, pursuant to a previously mentioned settlement, the CFTC has reserved issuing any penalties against Christiaan for the time being but, because that case is still pending, Christiaan may face penalties in the future including but not limited to debarment, a ban, or a fine.[10] He also faces potential economic penalties resulting from a civil class action filed against JPMorgan and its employees, including himself. Complaint, *Mehta v. JPMorgan Chase & Co.*,

---

[10] *See* CFTC Press Release.

No. 20-cv-05124 (E.D.N.Y. Oct. 24, 2020), ECF No. 1.  Christiaan's cooperation has lasted nearly four years, extended multiple times due to trial delays caused by the COVID-19 pandemic.  In spite of all of this, Christiaan is steadfast and resolute that he did the right thing in taking responsibility for his conduct and in cooperating with the Government.

## DISCUSSION

### VI.    Legal Standard

#### A.    The Sentencing Factors

The Court must conduct its own examination of the sentencing factors to arrive at a just sentence.  *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc); *see also Nelson v. United States*, 555 U.S. 350, 351–52 (2009) (per curiam); *see also Gall v. United States*, 552 U.S. 38, 46 (2007) (holding that the Sentencing Guidelines are merely advisory); *United States v. Booker*, 543 U.S. 220, 245 (2005).  Although the Guidelines serve as "the starting point and the initial benchmark" for the sentencing court's analysis, the Court's inquiry may not end there.  *Gall*, 552 U.S. at 49–50.  Indeed, the Court has broad discretion to set a sentence below the applicable Guidelines range.  *See Kimbrough v. United States*, 552 U.S. 85, 101–10 (2007) (holding that district courts are empowered to vary downward from the Guidelines because they are uniquely positioned to make the individualized assessments necessary for sentencing).  In doing so, the Court may consider and rely upon any available information concerning the background, character, or conduct of the defendant.  *Cavera*, 550 F.3d at 189–91; *see also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence").

Moreover, in making its individualized assessment, the federal sentencing paradigm makes clear that the court is not only empowered to impose a sentence below the Guidelines range, it is

*required* to do so where a lower sentence would be sufficient to comply with the purposes of § 3553(a). *See, e.g.*, *United States v. Dorvee*, 616 F.3d 174, 183–84 (2d Cir. 2010) (rejecting a "within Guidelines sentence" as "unreasonable" where the district court "offered no clear reason why the maximum available sentence, as opposed to some lower sentence, was required"). This is consistent with the long-standing federal judicial tradition to consider "every convicted person as an individual" and to uphold "the principle that the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487–89 (2011) (internal quotation marks omitted). In sum, the overarching task of a sentencing court is to fashion a sentence that is "sufficient, but not greater than necessary" to achieve the goals of punishment, deterrence, and rehabilitation. *Id.* at 491 (quotation marks omitted).

### B.    Substantial Assistance to the Government

In addition to the factors in 18 U.S.C. § 3553(a), a federal sentencing judge has discretion to depart from the Sentencing Guidelines if the prosecution makes a motion for a downward departure on the basis of the "defendant's substantial assistance to the authorities." *United States v. Brown*, 98 F.3d 690, 693 (2d Cir. 1996) (citing U.S.S.G. § 5K1.1). Because "[s]uccessful prosecutions frequently depend upon the credibility of cooperating witnesses in the eyes of the jury[,]" the prosecuting authority has the option to move for a downward departure pursuant to § 5K1.1 if he or she is "satisfied with the witness's testimony" at trial. *United States v. Doe*, 348 F.3d 64, 68 (2d Cir. 2003). When determining the sentence for a cooperating witness, the Court should consider a § 5K1.1 motion in tandem with the § 3553(a) factors. *See Brown*, 98 F.3d at 693.

VII.  **Application of Section 3553(a) Factors to Christiaan Demonstrates the Propriety of a Noncustodial Sentence.**

A.  **Christiaan is already rehabilitated and will not recidivate.**

1.  **Christiaan's decision to plead guilty and cooperate evinces rehabilitation.**

A defendant's potential for rehabilitation should be considered when determining a sentence. *See United States v. Wong*, 40 F.3d 1347, 1382 (2d Cir. 1994). To that end, a defendant's cooperation and acceptance of responsibility are factors that demonstrate this potential for rehabilitation. *See United States v. Bradford*, 645 F.2d 115, 117 (2d Cir. 1981) ("A defendant's cooperation may. . . be taken into consideration by a sentencing judge as a mitigating factor tending to evidence his potential for rehabilitation."); *United States v. Parker*, 903 F.2d 91, 105 (2d Cir. 1990) ("One of the goals of sentencing is rehabilitation. . . and a defendant's admission of responsibility or expression of contrition 'is often a significant first step towards his rehabilitation and, for that reason, deserving of a possible reward in the form of a lessened sentence.'" (quoting *Smith v. Wainwright*, 664 F.2d 1194, 1196 (11th Cir. 1981))).

Christiaan accepted responsibility and pled guilty, cooperated with the Government, and relinquished his dream job because he had engaged in spoofing and "had the guts to admit the truth." 7/19/22 Tr. 2290:16-17. He did so despite constant pressure from his boss and mentor, Michael Nowak, and with awareness that he would likely never work in the trading industry, let alone at JPMorgan, ever again. He did so knowing that he had been taught for years to trade that way and that he initiated those trades with different intentions than his co-conspirators. Finally, recognizing that his conduct was still wrong, Christiaan assisted the Government in its successful prosecution of his co-conspirators, helping the Government hold them accountable for their illegal market manipulation tactics. Moreover, Christiaan helped the Government secure its settlement with JPMorgan, resulting in a resolution pursuant to which JPMorgan paid a

23

significant fine and implemented modified compliance measures, including enhanced training and oversight – resources that likely would have mitigated or prevented Christiaan's involvement in the conspiracy had they been instituted earlier.

Christiaan has also accepted responsibility for his actions.  As the Court is aware, spoofing is a general intent crime that does not require knowledge that the conduct is unlawful during commission of the crime, nor does it require any fraudulent intent.  And still, even though Christiaan did not act with fraudulent intent, he took full responsibility for his involvement in the spoofing activity, pled guilty to the general intent violations, and cooperated with the Government.  He testified over three days at trial and endured rigorous and personal cross examination from highly skilled defense counsel for two days.  At no point did Christiaan minimize his role in the conspiracy, nor did he ever attempt to refute that he had committed a crime.

Since pleading guilty, Christiaan has reallocated much of his time to helping his family and others.  Following his resignation from JPMorgan, Christiaan devoted his newfound free time to volunteering at the Viscardi Center, a "network of nonprofit organizations serving several thousand people with disabilities annually through disability employment and training programs, day habilitation services, and operating a fully accredited school for severely disabled, nonverbal students who almost entirely use powered mobility to move about."  Exhibit 8, John Kemp Letter at 1.  He helped organize the Center's Annual Celebrity Sports Night in 2021, securing connections with athletes and other resources to create an entertaining and informative event for those serviced by the Viscardi Center.  *Id*.  Christiaan also spent several months after his resignation from JPMorgan helping establish and raise funds for Inclusively.com, a company devoted to helping disabled individuals secure employment.  Additionally, Christiaan and his

brothers established and contribute to a scholarship fund for young men without sufficient means to attend their high school. Finally, Christiaan spends the remainder of his free time caring for his wife and two young sons, Aksel and Oskar, cooking and cleaning, feeding and changing diapers, and spending time with them.

### 2.   Christiaan's history establishes that he will not recidivate.

Section 3553 mandates that the Court consider the "history" of the defendant. First-time offenders are "less likely to recidivate than all other offenders." *See United States v. Watt*, 707 F. Supp. 2d 149, 158 (D. Mass. 2010). The recidivism rate for first-time offenders is significantly lower than that of offenders with even one criminal history point. *Id.*; *see also United States v. Castillo*, No. 03 CR 835, 2007 WL 582749, at *7 (S.D.N.Y. Feb. 26, 2007) (noting the defendant's "lack of any criminal history" as grounds for imposing a below-Guidelines sentence in view of "the need for the sentence to provide adequate general and specific deterrence"). Before the conduct underlying his guilty plea, Christiaan had never been accused of or arrested for, much less convicted of, any crime. Based on his otherwise clear record, any further criminal activity is extraordinarily unlikely.

Moreover, Christiaan's personal history, both before and after his guilty plea, illustrates his historically exceptional character. His family members recall that he never got in trouble growing up. He was a well-rounded varsity athlete and a National Honor Society student. When his mother became terminally ill, Christiaan, a college student at the time, remained her "cheerleader," taking time off from school to be with her, all while caring for the rest of the family. Exhibit 2, Charles Trunz Letter at 1. After she passed away, Christiaan continued to help care for his family, staging an intervention for his brother who now says that, without Christiaan, he likely would not have been able to beat his addiction and would not have three beautiful children who have never seen him take a sip of alcohol. Exhibit 3, Chas Trunz Letter at

2–3.  He was also there for his two other brothers, welcoming them into his dorm room in Georgetown, his apartment in London, or his house in Long Island whenever they needed a distraction, a place to stay, or help with childcare during the pandemic.  Christiaan eventually started a family of his own and is an engaged and loving father to his two sons.

Christiaan has also remained committed to rehabilitation after his guilty plea.  When he was unemployed for many months after pleading guilty, Christiaan filled his time by volunteering with the Viscardi Center and raising funds for Inclusively.com, which helps disabled individuals find employment.  As mentioned, when he is not working, Christiaan devotes the majority of his time to caring for his children.  He took on the role of "stay at home parent" after his first son, Aksel, was born and his wife, Camila, returned to work.  Exhibit 1, Camila Vignaud Letter at 2.  He also expends significant time and effort supporting his father and brothers in whatever venture consumes them.  Christiaan's otherwise clear criminal record, established upstanding character, and cooperation demonstrate that he poses no risk of recidivism.

### B.  A sentence of time served would ensure that Christiaan is punished sufficiently but not more than necessary.

Christiaan has already experienced serious collateral effects as a result of his guilty plea and cooperation.  Christiaan resigned from the job he loved and is now likely unable to return to a regulated industry such as banking.  His conviction has also made it difficult for Christiaan to find work and support his family.  He has sought out opportunities, such as raising funds for and working at Inclusively.com, but, because of his guilty plea, was unable to maintain such prospects.  He unsuccessfully applied for over 100 jobs, sometimes even making it to the last round of interviews before receiving a rejection, and was consequently unemployed for almost two years.  Because of these hurdles, Christiaan has been unable to fully support his family and

26

has had to rely on financial assistance from his wife and father, often times unsure whether he would be able to pay rent.  In the future, Christiaan could also face additional fines and penalties resulting from the pending CFTC action and class action lawsuit.

Relatedly, due to the high-profile nature of the trial against his co-conspirators, Christiaan's guilty plea and cooperation have been widely publicized, causing reputational harm to Christiaan and his family.  He is now unable to participate in events that once meant a lot to him, such as alumni and mentorship events, and has lost many friends and connections because of the social stigma surrounding pleading guilty to spoofing.  This social marginalization has severely impacted Christiaan's mental health and day-to-day life for his family.

## C.    A noncustodial sentence of time served for Christiaan is appropriate to avoid unwarranted disparity.

In determining what constitutes a fair sentence for a particular defendant, the court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Indeed, noncustodial sentences are standard for cooperating witnesses in spoofing prosecutions for a reason.  "Successful prosecutions frequently depend upon the credibility of cooperating witnesses in the eyes of the jury."  *Doe*, 348 F.3d at 68.  Moreover, cooperating witnesses are critical to the successful prosecution of their co-conspirators in complex white-collar cases because they can explain financial industries and patterns that may not be otherwise clear-cut to the Government or a lay juror.  A disproportionate sentence for Christiaan may dissuade others from cooperating and assisting with future prosecutions.[11]

---

[11] *See United States v. Singh*, No. 13-CR-570, 2014 WL 4773982, at *2 (E.D.N.Y. Sept. 24, 2014) (affirming the defendant-appellant's sentence in part because of "the necessity of providing an incentive for criminal defendants to cooperate with the government in the future."); *United States v. Harrison*, 241 F.3d 289, 294 (2d Cir. 2001) ("[I]t also is a fact of life under the Sentencing Guidelines that Section 5K1.1 motions are virtually the only mechanism for defendants to bypass statutory

1.       **The defendants in this case.**

Christiaan respectfully advises the Court that on June 13, 2023, one cooperating witness in this case, John Edmonds, received a sentence of time served.[12]

Restitution to victims has already been satisfied in this case, thus discharging that mandatory condition.  *See* 18 U.S.C. § 3663A.  Accordingly, because pursuant to the corporate resolution between JPMorgan and the Government JPMorgan has already paid in full the restitution amount to compensate all victims in the case,[13] the Government properly has not moved for restitution.  *See Hsu v. United States*, 954 F. Supp. 2d 215, 222 (S.D.N.Y. 2013) (holding that the sentencing court had discretion to decline ordering restitution where victims were already compensated through other means).  Furthermore, the Government did not move for – and the sentencing court did not order – restitution for Edmonds.  Sentencing Memorandum, *United States v. Edmonds*, No. 18-cr-00239 (D. Conn. June 7, 2023), ECF No. 55; Judgment, *United States v. Edmonds*, No. 18-cr-00239 (D. Conn. June 15, 2023), ECF No. 57.

Indeed, when calculating the offense level, the Probation Office encourages the Court to consider that Christiaan did not personally profit from the conduct and his actions were at the direction of his superiors.  (PSR ¶ 80).  Nonetheless, the offense level is driven primarily by the loss amount, and the PSR proposes a 22-level increase in offense level based on loss amount.

---

mandatory minimum sentences, and they provide a strong incentive for guilty pleas."); *United States v. Mariano*, 983 F.2d 1150, 1155 (1st Cir. 1993) (noting that downward departures from the Sentencing Guidelines for cooperating defendants incentivize cooperation with the government).

[12] Edmonds was sentenced before the Honorable Robert N. Chatigny in the District of Connecticut. Minute Order, *United States v. Edmonds*, No. 18-cr-00239 (D. Conn. June 13, 2023), ECF No. 56; Judgment, *United States v. Edmonds*, No. 18-cr-00239 (D. Conn. June 15, 2023), ECF No. 57.  The other cooperating witness, Corey Flaum, has not yet been sentenced but is set to be sentenced before the Honorable Brian M. Cogan in this Court.  Order, *United States v. Flaum*, No. 19-cr-00338 (E.D.N.Y. Mar. 10, 2023).

[13] *See* PSR ¶¶ 15, 17, 76; *see also* JPMorgan Deferred Prosecution Agreement.

(*Id.* ¶ 23).  This loss amount – nearly entirely derived from the number of spoofing incidents engaged in by Smith alone, and not by Christiaan – disproportionately increases the loss amount ascribed to Christiaan.  A more accurate attribution of loss to Christiaan, based on his own trading activity, would assign roughly only about 5% of the loss amount to him, which would reduce Christiaan's offense level increased by 6 levels.  Moreover, whatever the loss amount calculation and attribution to Christiaan, it does not account for the fact that Christiaan was trained to trade this way by Nowak and Smith.  Nor does it account for Christiaan's role as a junior trader (which in fact results in a minor role reduction, (*id.* ¶ 26)), or the fact that, unlike his superiors and the bank itself, Christiaan derived no personal profit beyond continued employment, (*id.* ¶ 80).  And, of course, it does not account for Christiaan's valuable cooperation or his acceptance of responsibility.  *See United States v. Qualls*, 25 F. Supp. 3d 248, 259 (E.D.N.Y. 2014) (noting that a sentencing court can consider as mitigating factors "the level of harm. . . the nature of the victims, as well as the conduct and participation of Defendant" when ordering a sentence that varies from guidelines driven by loss amount), *aff'd*, 613 F. App'x 25 (2d Cir. 2015).

### 2.    Defendants in similar cases.

More broadly, cooperating witnesses charged with similar or more serious conduct than Christiaan historically have received noncustodial sentences without any restitution or fines.  In a somewhat similar case to Christiaan's, *United States v. Liew*, Mr. Liew, who also pled guilty to spoofing, which he explained was similarly at the advice of senior traders, and testified against his co-defendants at trial, received a noncustodial sentence of time served without any fines or restitution.  Judgment, *United States v. Liew*, No. 17-cr-00001 (N.D. Ill. Nov. 17, 2021), ECF No. 95.  In another spoofing case, *United States v. Zhao*, Mr. Zhao was sentenced to time served without any fines or restitution after pleading guilty to over four years of spoofing.  Amended

Judgment, *United States v. Zhao*, No. 18-cr-00024 (N.D. Ill. Feb. 18, 2020), ECF No. 78. Similarly, in *United States v. Mohan*, Mr. Mohan pled guilty to conspiracy to spoof and received a noncustodial sentence of one year of probation without any fines or restitution. Judgment, *United States v. Mohan*, No. 18-cr-00610 (S.D. Tex. July 19, 2021), ECF No. 56. Like Christiaan, Mr. Mohan informed the prosecution that he was a junior trader taught to spoof by his supervisors. However, in that case, Mr. Mohan never testified against his co-conspirators at trial because they either also pled guilty or never appeared. In contrast, Christiaan offered three days of trial testimony, including two days of intense cross examination.

Moreover, in contrast with Mr. Liew and Mr. Zhao, Christiaan has not been subject to any conditions of release other than a limited travel restriction since the time of his guilty plea in August 2019.[14] Therefore, it is unnecessary to impose any supervision on Christiaan as a part of his sentence.

## CONCLUSION

It is respectfully requested that the Court strongly consider the facts presented herein and impose a sentence of time served without supervision. An "individualized assessment" of Christiaan indicates that such a result would be "sufficient, but not greater than necessary" to achieve the objectives of sentencing in this case. *Kimbrough*, 552 U.S. at 101–10; 18 U.S.C. § 3553(a). Such a sentence will give recognition to Christiaan's profound remorse, acceptance of responsibility, and invaluable cooperation with the Government.

---

[14] The terms of his release only included that his travel be restricted to the United States, United Kingdom, and the European Union. Release Order, ECF No. 6.

Dated: June 16, 2023

Respectfully submitted,

By:＿＿＿/s/ Katya Jestin＿＿＿＿＿＿＿

Katya Jestin
Anthony S. Barkow
JENNER & BLOCK LLP
1155 6th Avenue
New York, New York 10036
Tel: (212) 891-1600
Fax: (212) 891-1699
kjestin@jenner.com
abarkow@jenner.com

*Counsel for Christiaan Trunz*

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on June 16, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, and that the foregoing document is being served this day on all counsel of record via transmission of Notice(s) of Electronic Filing.

Respectfully submitted,

By:    /s/ Katya Jestin          

Katya Jestin
Anthony S. Barkow
JENNER & BLOCK LLP
1155 6th Avenue
New York, New York 10036
Tel: (212) 891-1600
Fax: (212) 891-1699
kjestin@jenner.com
abarkow@jenner.com

*Counsel for Christiaan Trunz*

32