

U.S. Department of Justice

Criminal Division

*Fraud Section*                         *1400 New York Avenue NW*
                                        *Washington, D.C. 20530*

June 23, 2023

By ECF

The Honorable William F. Kuntz, II
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:    United States v. Christiaan Trunz
                  Criminal Docket No. 19 CR 375 (WFK)

Dear Judge Kuntz:

       The government respectfully submits this letter in advance of the defendant's sentencing, which is scheduled for June 27, 2023, at 2:00 p.m. On August 20, 2019, the defendant pleaded guilty, pursuant to a plea agreement, before United States District Judge Pamela K. Chen to an information charging him with one count of conspiracy to engage in spoofing, in violation of 18 U.S.C. § 371, and one count of spoofing, in violation of 7 U.S.C. §§ 6c(a)(5)(C) and 13(a)(2).[1] See ECF No. 4. For the reasons stated herein, the government respectfully moves the Court pursuant to U.S.S.G. § 5K1.1 to depart downward significantly from the advisory United States Sentencing Guidelines (U.S.S.G.) range and to impose a non-incarcerative sentence that reflects Mr. Trunz's subordinate role in the scheme, his total rehabilitation, and his significant cooperation against substantially more culpable defendants. The government's recommended sentence also would avoid an unwarranted sentencing disparity between Mr. Trunz and a similarly situated co-conspirator who also cooperated and received a non-incarcerative sentence in the District of Connecticut earlier this month.

I.      Background

      A.     Offense Conduct

       The defendant was a precious metals trader at Bear Stearns and, after that bank's collapse in mid-2008, at JPMorgan. His convictions in this case relate to the unlawful trading of precious metals futures contracts on exchanges operated by the CME Group, Inc. (CME) in

---

[1] While Judge Chen took the defendant's guilty plea on August 20, 2019, the case initially was assigned to Judge Sterling Johnson, Jr., and then reassigned to this Court on October 12, 2022.

Chicago, Illinois.[2] From approximately July 2007 to approximately August 2016, the defendant and his co-conspirators at Bear Stearns and later at JPMorgan conspired to manipulate the prices of precious metals futures contracts by placing orders into the market with no intent to actually execute those orders—a practice known as "spoofing." See 7 U.S.C. § 6c(a)(5)(C). The spoof orders injected false information regarding supply and demand into the market and induced other traders to react to that influx of false information, allowing the defendant and his co-conspirators to profit from the resulting changes in market conditions and price movements.

The spoofing scheme worked as follows: (Step 1) if the defendant wanted to purchase a gold futures contract (for example), he placed an order to buy. Then (Step 2), to facilitate the execution of the buy order, on the opposite side of the market he placed one or more fully visible orders to sell at different price levels (a so-called "layering" spoofing strategy). These were spoof orders. The purpose of the sell orders was not to sell; it was to create the illusion of supply—i.e., to make other market participants believe (falsely) that there was genuine, sizable selling interest in the market. Next (Step 3), other market participants reacted to the defendant's spoof sell orders by also placing sell orders, which had the effect of pushing market prices down, toward where the defendant's buy order was waiting to be executed. Finally (Step 4), once the defendant's buy order was filled, he quickly canceled his sell orders to avoid them being filled. The spoof orders were designed to, and at times did, move the price of precious metals futures contracts in a direction that was favorable to the defendant and his co-conspirators.

The spoofing conspiracy on JPMorgan's precious metals desk worked, generating profits for the desk and, in total, causing over $55 million in calculable losses to thousands of victims between 2008 and 2016. To date, the United States has convicted five former traders on the desk: (1) Michael Nowak, a Managing Director and the global head of precious metals trading at JPMorgan, (2) Gregg Smith, an Executive Director and the bank's head gold trader, (3) Christopher Jordan, an Executive Director and the head silver trader until his departure from JPMorgan in late 2009, (4) John Edmonds, a junior trader who joined the desk around the same time as Mr. Trunz and was a Vice President; and (5) Mr. Trunz, who was a Vice President during the conspiracy period and later was promoted to Executive Director.[3]

In July 2007, Mr. Trunz began working as a junior trader on the precious metals trading desk at Bear Stearns in New York. There, he took instruction from, and learned to trade by watching, the head gold trader, Mr. Smith. In mid-2008, JPMorgan acquired Bear Stearns, and Mr. Trunz and Mr. Smith joined JPMorgan's precious metals desk. JPMorgan ran one of the world's largest precious metals businesses through its precious metals desk, which had traders and salespeople located in offices in New York, Singapore, and London. Over his career at JPMorgan, Mr. Trunz worked on the precious metals desk in all three locations. As a trader at JPMorgan,

---

[2] The CME operates the world's largest financial derivatives exchange. A futures contract, which is a type of derivative, is a legally binding agreement to buy or sell an asset at a later date. Precious metals futures contracts are futures contracts for the purchase and sale of certain metals, including gold, silver, platinum, and palladium.

[3] The hierarchy on JPMorgan's precious metals desk, from lowest to highest position, was (1) Analyst, (2) Associate, (3) Vice President, (4) Executive Director, and (5) Managing Director.

Mr. Trunz was supervised by the desk's head, Mr. Nowak, and he modeled his trading practices on those of the senior traders, especially Mr. Smith.

At Bear Stearns and later at JPMorgan, Mr. Trunz quickly came to understand that he was expected to engage in spoofing and, over the course of the conspiracy, he spoofed thousands of times. Nevertheless, Mr. Trunz spoofed significantly less often, and correspondingly caused considerably less harm, than Mr. Smith. More specifically, Mr. Trunz spoofed about one-sixth as often as Mr. Smith, causing less than seven percent of the loss attributable to Mr. Smith ($3.6 million in loss for Mr. Trunz as compared to $47.9 million for Mr. Smith). Mr. Trunz did spoof more often than Mr. Nowak, although the corresponding loss amounts are similar ($3.6 million for Mr. Trunz as compared to $3.5 million for Mr. Nowak). This difference in the frequency of spoofing, however, is likely attributable to the different roles that Mr. Trunz (a junior trader learning under Mr. Smith on the desk) and Mr. Nowak (a supervisor of the worldwide precious metals desk who primarily focused on options trading) engaged in during the relevant period.

But even the relative numbers do not tell the full picture. Mr. Trunz was very much a junior member of the conspiracy. He was indoctrinated into the conspiracy at the age of 22, in his first job out of college. He followed the lead of the senior traders, and in particular Mr. Nowak and Mr. Smith. And while he indisputably is responsible for his actions (and has accepted responsibility for his crimes), he did not initiate the conspiracy or exercise any managerial control or decision-making authority with respect to the spoofing strategy that proliferated at Bear Stearns and JPMorgan. In every meaningful way, he is substantially less culpable than Mr. Nowak and Mr. Smith. Consistent with his reduced culpability, the Presentence Report (PSR) includes a minor role reduction in the defendant's Guidelines calculation.

B. Procedural History

The government's investigation of manipulative trading by member of JPMorgan's precious metals desk began in mid-2018. In October 2018, Mr. Edmonds (who, like Mr. Trunz, had been a junior member of JPMorgan's precious metals desk), pleaded guilty and admitted that he and his co-conspirators were engaged in spoofing at JPMorgan. See United States v. John Edmonds, 18 CR 239 (D. Conn.). In December 2018, two agents from the Federal Bureau of Investigation (FBI) approached Mr. Trunz at the Fort Lauderdale, Florida airport as Mr. Trunz was traveling between Puerto Rico and London, where he lived and worked for JPMorgan at the time. In that interview, Mr. Trunz denied that he engaged in spoofing. Years later, during the trial last summer in Chicago against Mr. Smith and Mr. Nowak, Mr. Trunz admitted that he lied to the FBI during the encounter in December 2018. But Mr. Trunz also provided relevant context: between the FBI approach in December 2018 and his guilty plea in August 2019, Mr. Nowak was exerting heavy pressure on Mr. Trunz to keep him from telling the truth and pleading guilty.

In August 2019, however, once Mr. Trunz made the decision to accept responsibility, cooperate, and plead guilty—notwithstanding the pressure from his boss, Mr. Nowak—Mr. Trunz significantly advanced the government's investigation and prosecution in multiple ways. Days after his guilty plea, Mr. Nowak, Mr. Smith, and Mr. Jordan were indicted in Chicago. See United States v. Smith, 19 CR 669 (N.D. Ill.). Later, in November 2019, the

government superseded and added a fourth defendant, Jeffrey Ruffo, who was a salesperson at JPMorgan.

In September 2020, JPMorgan entered into a significant corporate resolution with the government involving a deferred prosecution agreement (DPA) and the payment of $920 million in fines, forfeiture, and restitution.[4] See DPA, United States v. JPMorgan Chase & Co., 20 CR 175, ECF No. 2 (D. Conn. Sept. 29, 2020).

On August 10, 2022, after a 5-week trial in Chicago, a jury convicted Mr. Smith and Mr. Nowak of commodities fraud, spoofing, attempted commodities price manipulation, and multiple counts of wire fraud affecting a financial institution, arising from their manipulative trading on JPMorgan's precious metals desk. At that trial, Mr. Trunz testified for three days. In the government's view, Mr. Trunz's testimony was essential to securing the convictions of Mr. Nowak and Mr. Smith on every substantive count in their indictment—wire fraud, commodities fraud, attempted price manipulation, and spoofing.[5]

On December 9, 2022, after a separate 2-week trial, a jury convicted Mr. Jordan of wire fraud affecting a financial institution. See United States v. Jordan, 20 CR 669 (N.D. Ill.). The government did not call Mr. Trunz to testify at this trial.

Mr. Smith, Mr. Nowak, and Mr. Jordan are currently scheduled for sentencing on August 17, 18, and 31, respectively, in the Northern District of Illinois before the Hon. Edmond E. Chang.

II.     Sentencing Guidelines Calculation

The Amended PSR contains the following Guidelines calculation:

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(2)) | 6 |
| Loss of More Than $25,000,000 (§ 2B1.1(b)(1)(L)) | +22 |
| Offense Involved 10 or More Victims (§ 2B1.1(b)(2)(A)(i)) | +2 |
| Minor Role (§ 3B1.2(b) | -2 |
| Acceptance of Responsibility (§ 3E1.1(a)-(b)) | -3 |
| Total Offense Level: | 25 |

The government submits that the offense level should be increased by an additional 2 levels because, pursuant to Guideline § 2B1.1(b)(10), the offense conduct involved sophisticated means, including a "layering" strategy that was designed to trick algorithmic traders, and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. The government recognizes, however, that applying this enhancement is a closer call and notes that in two recent cases involving substantially similar offense conduct—namely, spoofing by Wall Street

---

[4] The resolution was based on the precious metals spoofing conduct at issue here, as well as a separate spoofing scheme involving the bank's U.S. Treasury bonds trading desk.

[5] Mr. Nowak and Mr. Smith were acquitted on two conspiracy charges, as was Mr. Ruffo, who was only charged in the two conspiracy counts.

traders in the precious metals futures markets—district courts have split on whether the sophisticated means enhancement should apply. Compare Sentencing Tr. 22:25-23:09, United States v. Vorley, 18 CR 35, ECF No. 400 (N.D. Ill. June 21, 2021) (applying the enhancement) with Order at 41-45, United States v. Bases, 18 CR 48, ECF No. 734 (N.D. Ill. Mar. 6, 2023) (declining to apply the enhancement). Mr. Smith and Mr. Nowak are scheduled for sentencing in August 2023, and the government similarly has taken the position that a sophisticated means enhancement should apply in connection with those sentencings, but the sentencing court has not yet ruled on the applicability of this enhancement. In addition, in connection with the recent sentencing of the defendant's co-conspirator, Mr. Edmonds, the Court adopted the PSR that applied an uncontested sophisticated means enhancement. See PSR ¶ 24, Edmonds, 18 CR 239, ECF No. 52 (D. Conn. May 25, 2023). Consistent with the government's position in Smith and Edmonds, the government submits that a sophisticated means enhancement is applicable here, which would increase the total offense level to 27.

Based on an offense level of 27, and the defendant being in Criminal History Category I, the advisory Guidelines range is 70 to 87 months' imprisonment and a fine of between $25,000 and $250,000.

In addition, the Court may wish to consider a downward variance from this range based on a newly approved amendment to the Guidelines, which will take effect on November 1, 2023, unless it is rejected by Congress. More specifically, the proposed U.S.S.G. § 4C1.1 provides for a 2-level decrease in a defendant's offense level for so-called "zero-point offenders," that is, defendants who have zero criminal history points and meet nine other criteria. Mr. Trunz meets all of these criteria. Of course, this Court is required to apply the version of the Guidelines in effect at the time of sentencing. See 18 U.S.C. 3553(a)(4)(A)(ii); U.S.S.G. § 1B1.11(a). Unless Congress provides otherwise, a proposed Guidelines amendment takes effect only after a prescribed period of congressional review has elapsed. See 28 U.S.C. 994(p); Stinson v. United States, 508 U.S. 36, 41 (1993) ("Amendments to the Guidelines must be submitted to Congress for a 6-month period of review, during which Congress can modify or disapprove them."). In this instance, absent Congressional action, the amendment will not take effect until November 1, 2023. If the Court is inclined to consider the 2-level reduction before it takes effect, the Court must calculate the Guidelines range under the current version of the Guidelines first. Then, if it wishes, the Court may vary downward in light of the proposed amendment to a total offense level of 25, with a corresponding Guidelines range of 57 to 71 months. If the Court varies downward, the government respectfully requests that the Court clearly state that the variance is because of the amendment so that the defendant will not receive a further reduction if the Sentencing Commission subsequently makes the amendment retroactive.

III.   Motion for Downward Departure Pursuant to U.S.S.G. § 5K1.1

The government respectfully moves the Court to depart downward pursuant to U.S.S.G. § 5K1.1. Throughout the past four years, Mr. Trunz has provided substantial assistance that led to the prosecution and conviction of multiple, more culpable co-conspirators and a landmark corporate case against JPMorgan. Section 5K1.1 of the Guidelines authorizes the Court to depart downward from the applicable Guidelines range upon the government's motion and provides that the extent of the reduction may be based on "(1) the court's evaluation of the

significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered; (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant; (3) the nature and extent of the defendant's assistance; [and] (5) the timeliness of the defendant's assistance." U.S.S.G. § 5K1.1(a). The government respectfully submits that these considerations support a significant downward departure here.

First, Mr. Trunz met with the government approximately ten times over the course of four years, and his cooperation significantly advanced the government's investigation and prosecution of other members of JPMorgan's precious metals desk. Prior to Mr. Trunz's cooperation, the government was aware that Mr. Smith had engaged in spoofing at Bear Stearns and had imported his spoofing scheme to JPMorgan. However, Mr. Trunz provided first-hand information from his experience working with, and learning to spoof from, Mr. Smith while at Bear Stearns. Mr. Trunz also worked closely with Mr. Smith and Mr. Ruffo at Bear Stearns and then later JPMorgan, and Mr. Trunz described how Mr. Smith and others (including Mr. Trunz) spoofed in order to get better prices for Mr. Ruffo's profitable hedge fund clients. In fact, the government's first indictment in August 2019 brought charges against Mr. Smith, Mr. Nowak, and Mr. Jordan. Based in part on the information from Mr. Trunz regarding Mr. Ruffo's involvement in the spoofing scheme, in November 2019, the government brought a superseding indictment that added Mr. Ruffo as a fourth defendant in the case.

In addition, at trial last summer against Mr. Smith, Mr. Nowak, and Mr. Ruffo in the Northern District of Illinois, Mr. Trunz was a central witness in the government's case, and in the government's view, an important factor in the convictions of Mr. Smith and Mr. Nowak.[6] Mr. Trunz testified for three days and was subject to blistering cross-examination by multiple defense attorneys. It is a challenge—a year removed and in the confines of a written submission—to portray for this Court the real-time impact of Mr. Trunz's trial testimony. But put simply, the jury was rapt. In the government's estimation, Mr. Trunz was the single most important witness who testified throughout all five weeks of the government's case-in-chief. His truthful testimony and his demeanor, especially during cross-examination, was compelling and made a significant difference in the outcome of the trial.

Finally, Mr. Trunz's cooperation was a significant factor in the government's resolution of its corporate case against JPMorgan, which included the imposition of ongoing compliance and reporting obligations on the bank together with the payment of $920 million in fines, forfeiture, and restitution.

Second, the information and testimony provided by Mr. Trunz was truthful, complete, and reliable. After his decision to accept responsibility, plead guilty pre-indictment, and cooperate, Mr. Trunz was forthcoming and did not minimize his conduct, but also never conformed his information or testimony to what he believed the government wanted to hear. The reliability of his information is shown, and affirmed, by the fact that JPMorgan admitted to the relevant criminal conduct and two separate juries convicted Mr. Smith, Mr. Nowak, and Mr. Jordan.

---

[6] As noted, Mr. Ruffo was only charged in two conspiracy counts and was acquitted on those counts.

<u>Third</u>, the nature and extent of Mr. Trunz's assistance over nearly four years involved multiple lengthy interviews, the review of charts showing spoofing activity, the interpretation of trader jargon contained in e-communications, and three days of testimony—including hours of intense cross-examination. Mr. Trunz's cooperation also extended for an unusually long duration (lengthened by trial delays in Chicago caused by the coronavirus pandemic), during which other witnesses might have expressed frustration, but Mr. Trunz cooperated for years without issue.

<u>Finally</u>, Mr. Trunz's cooperation was timely. While Mr. Trunz was not the first cooperator to plead guilty as part of the government's investigation, he did cooperate prior to the government's first indictment against members of JPMorgan's precious metals desk. In addition, the delay in his cooperation, at least in part, is likely related to the pressure that Mr. Nowak—his supervisor, mentor, and friend—placed on Mr. Trunz not to cooperate. But despite this pressure, after Mr. Trunz's decision to cooperate, he provided information that corroborated and provided additional depth to information that the government has gathered to date in its investigation. Put simply, Mr. Trunz allowed the government to have a more comprehensive picture of the spoofing scheme on JPMorgan's precious metals desk and present that full picture to the jury at trial.

IV. <u>Section 3553(a) Factors</u>

To be clear, but for the defendant's complete acceptance of responsibility and first-rate cooperation, the government would be advocating for a meaningful term of imprisonment in light of the Section 3553(a) factors. The defendant's crime was serious, and the need for general deterrence here is great. But other factors weigh heavily in favor of leniency, including Mr. Trunz's minor role in the conspiracy as a junior member of the precious metals desk (which is relevant to the nature and circumstances of his offense) and the need to avoid unwarranted sentencing disparities.

<u>First</u>, the defendant's crime was serious. Mr. Trunz conspired with other traders at Bear Stearns and JPMorgan to manipulate the market for their own gain. In the process, they caused other market participants to lose $55 million—a huge sum. The crime was long-running and threatened the integrity of core U.S. financial markets. But Mr. Trunz was a junior trader when he was indoctrinated into the conspiracy, and he was following the direction and example of his superiors and senior traders. Mr. Trunz did not play any role in planning or organizing the scheme and, unlike the senior traders against whom he testified, Mr. Trunz was not a Director-level employee of JPMorgan during the conspiracy period. And as set forth above, Mr. Trunz spoofed considerably less often, and with lower corresponding losses, than the most culpable defendant, Mr. Smith, and the loss directly attributable to his own spoofing ($3.6 million) is a fraction of the overall loss amount ($55 million).

<u>Second</u>, the government feels strongly there is a need to promote general deterrence in white-collar cases. Market manipulation is an under-prosecuted crime, and any sentence imposed in a manipulation case must send a clear message to deter others from toying with this nation's public markets. But at the same time, there also is a clear need in complex white-collar

cases to incentivize fulsome acceptance of responsibility and cooperation. It would be difficult to prosecute complicated trading cases like this one without cooperating witnesses to decode jargon, explain the trading at issue, and provide first-hand knowledge of the inner workings of the scheme. And of course, the most culpable members of JPMorgan's precious metals desk have been convicted and still await sentencing in Chicago, where the government has recommended a sentence of six years of imprisonment for Mr. Smith and five years for Mr. Nowak (at this time, the government has not made a recommendation regarding Mr. Jordan's sentence). It would be a just result, and promote both general deterrence and respect for the law, if the most culpable defendants receive meaningful terms of imprisonment while a junior member of the conspiracy who provided cooperation for four years receives leniency.

Third, the government perceives no need to specifically deter Mr. Trunz from future misconduct. He lacks any other criminal history, accepted responsibility, cooperated with the government, and has complied completely with his conditions of presentence release. Based on the facts known to the government, the defendant poses zero risk of recidivism. To the contrary, Mr. Trunz's efforts toward rehabilitation and leading a crime-free life over the past four years are commendable.

Fourth, Mr. Trunz's personal history and characteristics are significant mitigating factors, and his history and characteristics are detailed in the PSR and in the letters submitted on his behalf. As one additional comment, in the government's view, the strength of Mr. Trunz's character was demonstrated by his unwavering testimony at trial against Mr. Smith, Mr. Nowak, and Mr. Ruffo—all three of whom Mr. Trunz had a deep personal and professional relationship with for more than a decade.

Fifth, a lenient sentence would avoid unwarranted sentencing disparities between the defendant and his co-conspirators in this case as well as, more generally, among similarly situated cooperating defendants in other spoofing cases that engaged in similar conduct. As noted, Mr. Smith and Mr. Nowak have not been sentenced yet, but the government has recommended five- and six-year terms of imprisonment for those defendants, respectively. See United States' Sentencing Memorandum, Smith, 19 CR 669, ECF No. 856 (N.D. Ill. Mar. 20, 2023). Mr. Smith and Mr. Nowak were more senior to Mr. Trunz on JPMorgan's precious metals desk and directed his participation in the scheme. Mr. Smith engaged in more severe and extensive conduct than Mr. Trunz, and neither Mr. Smith nor Mr. Nowak cooperated nor accepted responsibility for their conduct. Both men also lied to conceal their conduct. Mr. Nowak lied to the principal commodities regulator, the Commodity Futures Trading Commission, and Mr. Smith lied to the CME in connection with its investigation into his trading practices. As the Seventh Circuit has aptly reasoned, "a sentencing difference is not a forbidden 'disparity' if it is justified by legitimate considerations, such as rewards for cooperation." United States v. Boscarino, 437 F.3d 634, 638 (7th Cir. 2006); see also United States v. Ebbers, 458 F.3d 10, 129 (2d Cir. 2006) (explaining that "a reasonable explanation of the different sentences" may arise from "the varying degrees of culpability and cooperation between the various defendants"). As such, the government believes that leniency for Mr. Trunz would not create an *unwarranted* sentencing disparity between him and his more culpable co-conspirators. In addition, Mr. Trunz's co-conspirator, Mr. Edmonds— who, like Mr. Trunz, was a more junior member of the conspiracy, pleaded guilty, cooperated with the government, and testified at the trial of Mr. Smith, Mr. Nowak, and Mr. Ruffo—was sentenced

earlier this month to time served, 12 months of supervised release, and a $25,000 fine. See Judgement, Edmonds, 18 CR 239, ECF No. 57 (D. Conn. June 15, 2023).

Nor would a lenient sentence for Mr. Trunz result in unwarranted sentencing disparities among similarly situated cooperating defendants in other cases who engaged in similar conduct. For instance, in a recent prosecution involving spoofing by precious metals traders at Deutsche Bank, the two Director-level defendants who were convicted after a trial in Chicago were sentenced to a year and a day in prison, see United States v. Vorley, 18 CR 35 (N.D. Ill.), while the junior trader who testified at trial as a cooperating witness received a probationary sentence, see United States v. Liew, 17 CR 1 (N.D. Ill.). Other defendants who pleaded guilty and cooperated with the government's investigation in spoofing cases typically have been sentenced to probation or time served.[7] See Judgment, United States v. Sarao, 15 CR 75, ECF No. 119 (N.D. Ill.) (time served, one-year home confinement); Judgment, United States v. Zhao, 18 CR 24, ECF No. 72 (N.D. Ill.) (time served); Judgment, United States v. Mohan, 18 CR 610, ECF No. 56 (S.D. Tex.) (1 year probation) but see Judgment, United States v. Gandhi, 18 CR 609, ECF No. 86 (S.D. Tex.) (24 months' imprisonment).[8]

Sixth, regarding the need to provide restitution to any victims of the offense, any restitution arising from Mr. Trunz's offense conduct has been satisfied in full by JPMorgan's payment of victim compensation pursuant to its corporate deferred prosecution agreement with the United States. See DPA ¶ 15, JPMorgan Chase & Co., 19 CR 175, ECF No. 2 (D. Conn. Sept. 29, 2020); see also 18 U.S.C. § 3664(h).

---

[7] The government recognizes that these cases involved defendants who were sentenced outside of this District and Circuit. However, the Second Circuit has explained that § 3553(a)(6)'s direction to avoid unwarranted sentence disparities focuses on "nationwide sentence disparities." United States v. Ghailani, 733 F.2d 29, 55 (2d Cir. 2013).

[8] In Gandhi, the defendant had pleaded guilty to two counts of conspiracy relating to two separate spoofing conspiracies. Based on the defendant's substantial assistance, which involved a corporate resolution with the defendant's former trading firm where he engaged in spoofing, but no trial testimony, the government moved for a downward departure under § 5K1.1, and the Court departed downward significantly from a Sentencing Guidelines range of 87 to 108 months.

V. Conclusion

For the foregoing reasons, the government moves the Court to depart downward significantly pursuant to Section 5K1.1 of the Sentencing Guidelines and respectfully requests that the Court impose a sentence upon the defendant that reflects his significant cooperation and the mitigating factors under Section 3553(a), specifically, a sentence that does not include a term of incarceration.

Respectfully submitted,

GLENN S. LEON
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

By: /s/*Matthew F. Sullivan*
Avi Perry, Deputy Chief
Matthew F. Sullivan, Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Avenue NW
Washington, DC 20005
(202) 578-6583
matthew.sullivan2@usdoj.gov

cc:Clerk of the Court (WFK) (by ECF and Email)
Katya Jestin & Anthony S. Barkow (by ECF)
Roberta Houlton, United States Probation Officer (by Email)